**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COLE HICKMAN, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FLYWIRE CORPORATION, MICHAEL MASSARO, COSMIN PITIGOI, MICHAEL ELLIS, and ROB ORGEL, | |
| Defendants. | |

Plaintiff Cole Hickman ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Flywire Corporation ("Flywire" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Flywire securities between

1

February 28, 2024 and February 25, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Flywire, together with its subsidiaries, operates as a payments-enablement and software company in the U.S. and internationally. The Company's payment platform and network, as well as its vertical-specific software, purportedly facilitate payments between clients and customers in a variety of industries.

3.      Although Flywire has a wide range of clients across various verticals—*i.e.*, markets encompassing a group of companies and customers that are all interconnected around a specific niche—its largest vertical is education, the volumes and revenue from which rely on international enrollments and student school preferences. Accordingly, Flywire's business in the education industry is of particular importance to investors and analysts, especially the Company's Americas market, consisting of the U.S. and Canada, as well as its Asia and Pacific region ("APAC") market, including Australia. To assess its financial performance in these markets, Flywire utilizes a number of non-GAAP[1] financial measures important to investors, including, *inter alia*, revenue less ancillary services ("RLAS") and foreign exchange ("FX") neutral RLAS.

4.      In January 2024, the Canadian government began announcing intake caps on international student permit applications, thereby reportedly reducing the number of international students coming to Canada. This, in turn, resulted in a corresponding reduction in payment flows and an adverse effect on Flywire's business. Likewise, since late 2023, the Australian government

---

[1] "GAAP" refers to generally accepted accounting principles.

has tightened international student visa rules through various measures, which have likewise had an adverse impact on the Company's business.

5.    Notwithstanding the foregoing permit- and visa-related headwinds, at all relevant times, Defendants consistently touted the sustainability of Flywire's revenue growth and financial condition, while downplaying the anticipated negative impacts of permit- and visa-related headwinds on the Company's business.  For example, as late as November 2024, Defendants represented, among other things, that Flywire was and would remain a purported "Rule of 40"[2] company with strong revenue growth, while indicating that, for full year ("FY") 2025, FX neutral RLAS growth year-over-year ("Y/Y") was expected to be in the low 20% range, that revenue growth in Canada would be relatively flat compared to 2024, and that Defendants observed merely an early moderation in the revenue growth rate in Australia.

6.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the strength and sustainability of Flywire's revenue growth was overstated; (ii) the negative impact that permit- and visa-related restrictions were having and were likely to have on Flywire's business was understated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7.    On February 25, 2025, Flywire issued a press release announcing its fourth quarter ("Q4") and FY 2024 financial results.  Therein, for Q4 2024, the Company reported a loss per share of $0.12, missing consensus estimates by $0.12, and revenue of $117.6 million, missing

---

[2] The Rule of 40 is a financial benchmark used to determine the value prospect of investing in software-as-a-service ("SaaS") companies, which states that, at scale, the combined value of the company's revenue growth rate and profit margin should exceed 40% for healthy SaaS companies.  In recent years, the Rule of 40 has gained widespread adoption as a popularized measure of growth by SaaS investors.

consensus estimates by $1.25 million.  In discussing these results, Flywire's Chief Executive Officer ("CEO") Defendant Michael Massaro ("Massaro") blamed "a complex macro environment with significant headwinds[.]"  Defendant Massaro also announced that the Company would "undertak[e] an operational and business portfolio review" and certain "efficiency measures" including "a restructuring, which impacts approximately 10% of our workforce."  Flywire's Chief Financial Officer ("CFO") Defendant Cosmin Pitigoi ("Pitigoi") also advised that "[f]or our 2025 financial outlook, we project [RLAS] growth of 10-14% on an FX-neutral (constant currency) basis"—significantly less than low 20% range previously provided to investors.

8.     The same day, Flywire held a conference call with investors and analysts to discuss its Q4 and FY 2024 results.  During the call, Defendants revealed that the Company's business in the education sector had significantly deteriorated due to worsening permit- and visa-related headwinds, including "double digit declines in student visa issuance in our big four geographic markets," with "continued visa policy restrictions" anticipated in 2025.  Significantly, Defendant Pitigoi disclosed that Defendants "expect revenue in ***both*** [Canadian and Australian] markets to be down ***over 30%*** [Y/Y]" because of "recent policy changes" and "new visa rules [that] are starting to affect demand[,]" while also citing headwinds in the Company's U.S. market on similarly shifting visa trends.[3]

9.     The same and the following day, multiple analysts downgraded their recommendation on Flywire and/or cut their price target ("PT") on the Company's stock, citing its poor Q4 and FY 2024 results.  Multiple analysts also noted that Flywire's forecasted FY 2025 revenue growth, particularly with respect to U.S., Canadian, and Australian markets, was unexpected and/or stood in sharp contrast to Defendants' prior representations.

---

[3] All emphases herein are added unless otherwise noted.

10.     Following the foregoing disclosures and analyst downgrades and PT cuts, Flywire's voting common stock price fell $6.59 per share, or 37.36%, to close at $11.05 per share on February 26, 2025.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Flywire's most recent quarterly report on Form 10-Q, as of May 1, 2025, the Company had 119,685,024 shares of its voting common stock outstanding.  Flywire's voting common stock trades on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Flywire's securities located in the U.S., some of whom undoubtedly reside in this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Flywire securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Flywire is a Delaware corporation with principal executive offices located at 141 Tremont Street #10, Boston, Massachusetts 02111.  The Company's voting common stock trades in an efficient market on the NASDAQ under the ticker symbol "FLYW."

18.     Defendant Massaro has served as Flywire's CEO at all relevant times.  During the Class Period, Defendant Massaro sold 852,126 shares of Flywire's voting common stock for total proceeds of approximately $4.67 million.

19.     Defendant Pitigoi has served as Flywire's CFO since March 4, 2024.

20.     Defendant Michael Ellis ("Ellis") served as Flywire's CFO from before the start of the Class Period to March 4, 2024.

21.     Defendant Rob Orgel ("Orgel") has served as Flywire's President and Chief Operating Officer ("COO") at all relevant times.  During the Class Period, Defendant Orgel sold 46,096 shares of Flywire's voting common stock for total proceeds of approximately $1.05 million.

22.     Defendants Massaro, Pitigoi, Ellis, and Orgel are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Flywire's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Flywire's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Flywire, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.    Flywire and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Flywire, together with its subsidiaries, operates as a payments-enablement and software company in the U.S. and internationally.  The Company's payment platform and network, as well as its vertical-specific software, purportedly facilitate payments between clients and customers in a variety of industries.

26.    Historically, Flywire's Americas and APAC markets have accounted for an outsized portion of the Company's revenues.  For example, during the three months ended March 31, 2024, Americas and APAC clients accounted for 50.7% and 17.6% of the Company's total revenues, respectively, whereas during the same period in 2023, Americas and APAC clients accounted for 63.8% and 13.2% of the Company's total revenues, respectively.  Likewise, during the three months ended June 30, 2024, Americas and APAC clients accounted for 40.5% and 18.1% of the Company's total revenues, respectively, whereas during the same period in 2023, Americas and APAC clients accounted for 51% and 15.4% of the Company's total revenues, respectively.

27.     Although Flywire has a wide range of clients across various verticals, its largest vertical is education, the volumes and revenue from which rely on international enrollments and student school preferences.  Accordingly, Flywire's business in the education industry is of particular importance to investors and analysts, especially the Company's Americas and APAC markets.  To assess its financial performance in these markets, Flywire utilizes a number of non-GAAP financial measures important to investors, including, *inter alia*, RLAS and FX neutral RLAS.  RLAS represents the Company's consolidated revenue in accordance with GAAP less pass-through cost for printing and mailing services and marketing fees, whereas FX neutral RLAS is RLAS adjusted to show presentation on a constant currency basis, thereby providing a comparable framework for assessing how the business performed excluding the effect of foreign currency fluctuations.

28.     In January 2024, the Canadian government began announcing intake caps on international student permit applications, thereby reportedly reducing the number of international students coming to Canada.  This, in turn, resulted in a corresponding reduction in payment flows and an adverse effect on Flywire's business.  Likewise, since late 2023, the Australian government has tightened international student visa rules through various measures, which have similarly had an adverse impact on the Company's business.  Notwithstanding the foregoing headwinds, at all relevant times, Defendants consistently touted the sustainability of the Flywire's revenue growth and financial condition, while downplaying the anticipated negative impacts of permit- and visa-related headwinds on the Company's business.

### Materially False and Misleading Statements Issued During the Class Period

29.     The Class Period begins on February 28, 2024.  On February 27, 2024, during after-market hours, Flywire issued a press release announcing its Q4 and FY 2023 financial results.  The

press release stated, in relevant part, that "[i]n education, the Company continued to expand its higher education footprint globally including . . . throughout Asia-Pacific" and "continued to see success in its land and expand strategy in the U.S., increasing the footprint of its full-suite solution, and landing many blue-chip clients."

30.    Defendant Massaro, as quoted in the same press release, touted Flywire's strong Y/Y revenue growth, as well as the purported sustainability of this growth notwithstanding a complex macroeconomic environment, stating, in relevant part:

> Our strong fourth quarter results, which included nearly 43% [Y/Y] growth in [RLAS], capped off an exceptional year for Flywire as we continue to show strong performance across the business . . . . We are . . . excited for what is ahead for Flywire, with a plan that puts up strong growth numbers in a complex macro environment[.]

31.    With respect to the headwinds that Flywire was experiencing in the Canadian education market, as well as the anticipated impact that these headwinds were likely to have on the Company's business, Defendant Ellis, as quoted in the same press release, merely stated:

> Our seasonality across the fiscal year, and our results for Q1, are expected to be impacted by Canadian regulatory changes, which will reduce the number of international study permit applications and delay some Canadian applications until later in the year. The changes may also lead some students to study in other countries.

32.    On February 28, 2024, Flywire filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K purported to warn that Flywire's "clients in the education sector **may** be adversely affected by decreases in enrollment, pressure on tuition costs, or increased operating expenses, which **may** reduce demand for [its] solutions[,]" while simultaneously downplaying these risks. For example, the 2023 10-K stated, *inter alia*, that "[g]lobal conflict and restrictions on immigration or increased limitation on the award of student visas (such as those

recently announced in Canada and Australia) *can* negatively impact the cross-border education industry and schools that rely on foreign student populations[.]"  Plainly, this risk warning was a generic, catch-call provision that was not tailored to Defendants' actual known risks regarding then-known or anticipated Canadian and Australian policy changes and visa rules.

33.    The 2023 10-K further downplayed the forgoing risks by touting Flywire's go-to-market strategy, particularly its "regional sales teams . . . located in the United States, Canada, . . . and Australia[,]" as well as its "relationship management team" which purportedly "augments direct sales capabilities by cultivating existing relationships and identifying cross-sell and up-sell opportunities of additional solutions, contributing to our strong dollar-based net retention rate."

34.    Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Massaro and Ellis certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

35.    On May 7, 2024, Flywire issued a press release announcing its first quarter ("Q1") 2024 financial results.  Defendant Massaro, as quoted in the press release, highlighted the Company's growth in the quarter, as well as the purported "strength and resilience" of the Company's global business, stating:

> We are pleased with our 2024 first quarter results, where we signed more than 200 new clients, the highest the company has signed in a quarter . . . . This solid start to our year reflects the strength and resilience of our global and diversified business and underscores the penetration opportunity we have in the end markets we serve.

Looking ahead, I remain confident that our focus on optimizing our Go-To-Market capabilities, expanding our Flywire Advantage and strengthening our FlyMate community will position us well for the future.

36.     Defendant Pitigoi, as quoted in the same press release, downplayed the negative impact that Canadian regulatory changes in the education sector were having and were likely to have Flywire's business, stating, in relevant part:

I am excited by . . . the long term growth opportunity at Flywire . . . . [W]e are uniquely positioned to capture share with our 'software drives value in payments' approach . . . . For Fiscal-Year 2024 we are maintaining our top line growth expectations on a constant currency basis . . . . Second quarter guidance is adjusted for foreign exchange impacts and a shift in expectations related to our Canadian education business.

37.     Also on May 7, 2024, Flywire filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q contained the same generic, boilerplate risk warnings as referenced in ¶ 32, *supra*, regarding factors that "***may***" or "***can***" adversely affect Flywire's clients in the education sector, the cross-border education industry, and accordingly the Company's business, which were not tailored to the Company's actual known risks regarding then-known or anticipated Canadian and Australian policy changes and visa rules.

38.     Appended as exhibits to the Q1 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Massaro and Pitigoi.

39.     On August 6, 2024, Flywire issued a press release announcing its second quarter ("Q2") 2024 financial results. Defendant Massaro, as quoted in the press release, continued to tout the Company's purported "resilient performance" and revenue growth, notwithstanding permit-related revenue headwinds in the Canadian education sector, stating:

Our second quarter results demonstrate resilient performance across the business where we signed more than 200 new clients and grew revenue by 22% and [RLAS] by 26% year-over-year, despite revenue headwinds related to the ongoing Canadian

government actions involving student study permits . . . . These results reflect our ability to both grow within our existing accounts and drive revenue diversity, demonstrating continued progress against our strategy of optimizing our Go-To-Market capabilities, expanding our Flywire Advantage and strengthening our FlyMate community.

40.    Likewise, Defendant Pitigoi, as quoted in the same press release, continued to downplay the negative impact that Canadian regulatory changes in the education sector were having and were likely to have on Flywire's business, stating, in relevant part:

We had a strong quarter across many of our key operating metrics and financial measures . . . . Our first half results demonstrate the resilience of our team and our business model despite softer than expected performance in our Canadian education business. For Fiscal Year 2024, we are lowering our revenue outlook due to our current expectations regarding the external headwinds in Canada and raising our Full Year Adjusted EBITDA guidance[.]

41.    Also on August 6, 2024, Flywire filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2 2024 10-Q").  The Q2 2024 10-Q contained the same generic, boilerplate risk warnings as referenced in ¶ 32, *supra*, regarding factors that "***may***" or "***can***" adversely affect Flywire's clients in the education sector, the cross-border education industry, and accordingly the Company's business, which were not tailored to the Company's actual known risks regarding then-known or anticipated Canadian and Australian policy changes and visa rules.

42.    Appended as exhibits to the Q2 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Massaro and Pitigoi.

43.    On September 26, 2024, Flywire issued a press release announcing that it had purportedly showcased its strength in the U.S. education market during its inaugural conference for U.S. higher education clients.  The press release stated, *inter alia*:

**Building on strengths in cross-border payments, Flywire's full-suite solution delivers meaningful ROI** [return on investment]

12

Nearly 1,000 institutions in the U.S. rely on Flywire to streamline the cross-border tuition payment experience for their international students and automate reconciliation for the finance office. Building on this momentum, Flywire has also accelerated its ability to solve some of the most challenging issues in domestic (U.S. - U.S.) payments, such as managing dynamic payment plans and past-due collections, and driving even greater value to its growing client base.

The excitement over Flywire's unique expertise in solving both international and domestic payments was a key takeaway the Flywire Fusion conference, where [Defendant] Orgel . . . unveiled a number of key ROI metrics of its Student Financial Software (SFS) platform, including:

- **100+ institutions in the U.S.** are powered by the SFS platform and solutions, which manages billing, payments and payment plans, and past-due tuition collection from within a single platform;
- **620+ thousand** payment plans have been activated to make education more affordable;
- **$276+ million** has been collected in past-due tuition by institutions run on Flywire;
- **$55+ million** has been achieved in pre-collection savings for partner institutions.

44.    On November 7, 2024, Flywire issued a press release announcing its third quarter ("Q3") 2024 financial results. The press release quoted Defendant Massaro as stating, in relevant part:

Our [Q3] results highlight our ability to capture higher payment volumes with new and existing clients, signaling the growth potential within our accounts and verticals . . . . These results reflect our diversified business, strength of our land and expand Go To Market motion, and strong performance culture of our Flymates.

45.    The press release also quoted Defendant Pitigoi as stating, in relevant part:

We delivered another strong quarter with both revenue and Adjusted EBITDA coming in at the high end of our guidance, driven by strong core performance across our verticals, during our largest education peak quarter . . . . For [FY] 2024, we are raising the low end of revenue and Adjusted EBITDA guidance. Flywire has been and expects to continue to be a Rule of 40 company and we are confident in our strong Free Cash Flow and GAAP net income profitability trajectory ahead.

46.    Also on November 7, 2024, Flywire hosted a conference call with investors and analysts to discuss its Q3 2024 results and expectations for Q4 and FY 2024 (the "Q3 2024

Earnings Call"). During his prepared remarks on the call, Defendant Orgel downplayed the true scope and severity of the headwinds Flywire was experiencing, and was likely to experience, in its Canadian and Australian education markets, stating, *inter alia*:

> [W]e are taking a long view on Canada and continue to work hard to serve existing clients, expand our client footprint by winning more Canadian institutions and expand our product footprint in that market. In the absence of better news that builds demonstrated momentum with student volumes, ***we are preparing for 2025 revenue in Canada to be relatively flat with 2024***.

> There are headlines about caps and immigration policy emerging from Australia as well. Australia education is a smaller market for us compared to Canadian education. Overall, Australian education is a high single-digit percentage of our revenue, which includes our legacy higher education cross-border revenue and revenue related to our acquisitions of StudyLink and Cohort Go. ***Yet we are seeing early moderation in the revenue growth rate***, and we are watching Australian developments closely.

47. During the question-and-answer phase of the Q3 2024 Earnings Call, an analyst inquired as to "how we should think about the growth algorithm of the business from here, understanding you've got some headwinds from Australia heading into [20]25?" In response, Defendants Massaro and Pitigoi, like Defendant Orgel, downplayed the true scope and severity of the headwinds Flywire was experiencing, and was likely to experience, in its Canadian and Australian education markets, while simultaneously touting the Company's purportedly strong growth rate, stating, in relevant part:

> **[Defendant] Massaro**

> [. . . .] Obviously, we think we put up some pretty good numbers so far for this year. I mean, near 26% growth. ***That's with a $30 million headwind that was unexpected.*** Obviously, really strong record of expanding margins continued year-on-year for us. And so I think anybody can kind of add what that headwind is into our number and see where our growth rate would have been. It would have been also even better than we're doing here, ***but we're doing that with a pretty significant headwind***.

> [. . . . T]here's no snapback we're expecting coming from Canada. ***It's likely to improve over time.*** So obviously, we're not guiding [20]25 yet, but I think ***people***

*should consider us a Rule of 40 company* with increasing EBITDA margin expansion, as you said, within our prior range . . . .

**[Defendant] Pitigoi**

[. . . .] So the way to think about -- as we look at next year, first, as I said, look, long term, *Rule of 40 and continuing to drive strong revenue growth, I think as you look at this year, in particular, I think it's a good starting point* . . . . So revenue is at 26% at the point in Q4, very similar to [FY]. And as I've said in my remarks, about roughly 2 points of that is from inorganic growth and call it another low sort of single-digit is from FX. Obviously, in Q4, that's a little bit more. You've seen FX moving around quite a bit . . . . But net-net, *when you look at the combination of that sort of on an FX-neutral organic basis, we're in the low 20s there plus*.

But again, *really strong growth for the year* . . . . *So overall, feel good about that Rule of 40.* Obviously, we're well in that even this year with an 8-point headwind. And so as we exit the quarter, look, we're not giving 2025 guidance right now. But we're going to get through sort of the December peak season, and we'll see how it kind of plays out as we do our usual planning cycle. *But feel really, really good about kind of where we are as a business. And despite all of these pressures, the team is executing at a sort of admirable pace.* So very excited about the future.

48.     Also on November 7, 2024, Flywire filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024 (the "Q3 2024 10-Q").  The Q3 2024 10-Q contained substantively the same generic, boilerplate risk warnings as referenced in ¶ 32, *supra*, regarding factors that "*may*" or "*can*" adversely affect Flywire's clients in the education sector, the cross-border education industry, and accordingly the Company's business, which were not tailored to the Company's actual known risks regarding then-known or anticipated Canadian and Australian policy changes and visa rules.

49.     Moreover, the Q3 2024 10-Q stated, in relevant part:

We continue to see growth in new customers in both our Canada and Australia education markets, providing a lever to offset some of the expected decline in new incoming international student growth resulting from these government changes to international student visa policies. *Our business continues to remain strong amid these visa-related policy shifts*, benefiting from our increasingly global and diversified footprint across verticals, sub-sectors, countries, currencies and clients.

The foregoing positive statements further downplayed the anticipated negative impact that headwinds in Flywire's Canadian and Australian education markets were likely to have on the Company's business and financial results.

50.    Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Massaro and Pitigoi.

51.    The statements referenced in ¶¶ 29-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the strength and sustainability of Flywire's revenue growth was overstated; (ii) the negative impact that permit- and visa-related restrictions were having and were likely to have on Flywire's business was understated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

52.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Flywire to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants failed to disclose, *inter alia*, the actual negative impact that permit- and visa-related restrictions were having and were likely to have on Flywire's business.  Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Emerges**

53.    On February 25, 2025, during after-market hours, Flywire issued a press release announcing its Q4 and FY 2024 financial results (the "Q4/FY 2024 Earnings Release").  Therein, for Q4 2024, the Company reported a loss per share of $0.12, missing consensus estimates by $0.12, and revenue of $117.6 million, missing consensus estimates by $1.25 million.  Defendant Massaro, as quoted in the same press release, blamed these disappointing results on "a complex macro environment with significant headwinds" and disclosed that the Company "will be undertaking an operational and business portfolio review" and certain "efficiency measures" including "a restructuring, which impacts approximately 10% of our workforce."

54.    Further, Defendant Pitigoi, as quoted in the Q4/FY 2024 Earnings Release, advised that, "[f]or our 2025 financial outlook, we project [RLAS] growth of 10-14% on an FX-neutral (constant currency) basis"—significantly less than "the low 20s . . . plus" figure he provided only a quarter ago during the Q3 2024 Earnings Call.

55.    The same day, also during after-market hours, Flywire hosted a conference call with investors and analysts to discuss its Q4 and FY 2024 results (the "Q4/FY 2024 Earnings Call"). During the call, Defendant Massaro disclosed that "2024 presented some headwinds, particularly in our education business with double digit declines in student visa issuance in our big four geographic markets," and that "we anticipate continued visa policy restrictions in 2025[.]"

56.    During the same call, Defendant Orgel provided additional color regarding the severity of the headwinds that Flywire had experienced in its Canadian and Australian markets, while also revealing that the Company's U.S. education market had likewise deteriorated, in each instance as a result of permit- and visa-related headwinds:

> There were . . . notable headwinds we faced in Q4 in three of our core education markets. Starting with Canada, the Canadian government made an unexpected Q4

visa policy change eliminating a visa fast track option called the Student Direct Stream. That accelerated visa program required applicants to prepay full year tuition. The reduced overall student volume combined with reduced full year payments in Q4 led to a $3 million revenue shortfall in the quarter.

\* \* \*

In Australia, the government's new policies started to impact student volumes in Q4. And while the impact was more modest than Canada this past year, we see that impact continuing this year . . . . Finally, in terms of headwinds, our U.S. market saw slower growth in Q4 due to shifting visa trends.

57.     Meanwhile, Defendant Pitigoi advised during the 4Q/FY24 Earnings Call that Defendants "***expect revenue in both [Canadian and Australian] markets to be down over 30% [Y/Y]***" because of "recent policy changes" and "new visa rules [that] are starting to affect demand."

58.     Between after-market hours on February 25, 2025 and pre-market hours on February 26, 2025, multiple analysts downgraded their recommendation on Flywire and/or cut their PT on its stock.  For example, Deutsche Bank downgraded Flywire to a "hold" from "buy" recommendation and its PT on the Company's stock to $16.00 from $26.00, implying a 9.3% decrease from Flywire's last closing price.  Deutsche Bank stated that Flywire's FY 2025 forecast of approximately 12% constant-currency revenue growth at the midpoint was "disappointing" and "sharply contrasted with mgmt.'s commentary on the 3Q24 earnings call and at public conferences in Dec[ember] where the company pointed to low-20s growth/Rule of 40[.]"  Deutsche Bank further noted that "[t]he main drivers of the weak guide were the usual suspects, namely Canada and Australia, where revenue growth is now expected to decline -30% Y/Y vs prior expectations for flat Y/Y growth in Canada and growth 'below company avg.'"

59.     Similarly, BTIG downgraded Flywire to a "neutral" from "buy" recommendation, citing headwinds for Canada and Australia that were "worse than feared" and unfavorable headwinds for U.S. student visa trends.  BTIG stated that "[e]ven if FY25 guidance that missed

Street estimates by a long shot is baking in a worst-case scenario, we do not see how investors can gain any confidence in the company's top-line growth algorithm until it strings together a few quarters of consistency[.]"

60.    Goldman Sachs likewise downgraded Flywire to a "neutral" from "buy" recommendation, as well as set a $15.00 PT on the Company's stock, implying a 15% decrease from its last closing price.  Goldman Sachs called Flywire's "guidance . . . disappointing, with the company guiding roughly 10% below consensus at the midpoint[.]"  Goldman Sachs further observed that, "[w]hile we had expected weaker than consensus guidance as a function of FX, the company is now anticipating a 30% decline in CAD/AUS cross border education revenues in 2026, from its prior expectation of flat Canada, and is also baking in incremental pressure in the U.S. following a decline in student visa issuance more recently."  Goldman Sachs concluded that "we believe investors were looking for a stabilization in some of these trends, and were not expecting new issues in the U.S., given student immigration has not been a major point of policy discussion in the new administration."

61.    Various other analysts similarly reacted negatively, with Raymond James downgrading Flywire to an "outperform" from "strong buy" recommendation and cutting its PT on the Company's stock to $17.00 from $29.00, noting that Flywire's FY 2025 constant-currency revenue guidance was "well below even the most bearish expectations"; UBS downgrading Flywire to a "neutral" from "buy" recommendation and cutting its PT on the Company's stock to $15.00 from $25.00, citing "[c]ontinued demand pressure in core four education markets weighing on [RLAS] growth"; Morgan Stanley cutting its PT to $15.00 from $21.00 and likewise calling the Company's results "disappointing"; and Stephens downgrading Flywire to an "equal-weight" from "overweight" recommendation while also setting a $15.00 PT on the Company's stock.

62.     Following the Q4/FY 2024 Earnings Release and Call, as well as the foregoing analyst downgrades and PT cuts, Flywire's voting common stock price fell $6.59 per share, or 37.36%, to close at $11.05 per share on February 26, 2025.

63.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

64.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Flywire securities, Defendants Massaro and Orgel sold thousands of shares of the Company's voting common stock for millions of dollars in proceeds during the Class Period.  Specifically, during the Class Period, Defendant Massaro enriched himself by approximately $4.67 million by selling 852,126 shares of Flywire's voting common stock, whereas Defendant Orgel enriched himself by approximately $1.05 million by selling 46,096 shares of the Company's voting common stock.

65.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, at all relevant times, Flywire's education vertical, particularly in the Company's U.S., Canadian, and Australian markets, represented a considerable portion of the Company's revenues and was of paramount importance to the Company and investors.  Moreover, the Canadian and Australian governments implemented measures to tighten international student permit and visa applications before the start of the Class Period, and Defendants were keenly focused on Flywire's performance in light of these headwinds throughout the Class Period, as exemplified by their statements

referenced herein.  Notwithstanding these issues, Defendants touted the strength and sustainability of Flywire's revenue growth, while downplaying the negative impact that these headwinds were having, and were likely to continue to have, on the Company's business, thereby maintaining artificially high prices for Flywire securities during the Class Period.   In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Flywire securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Flywire securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Flywire or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Flywire;

- whether the Individual Defendants caused Flywire to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Flywire securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Flywire securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Flywire securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

73.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

74.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Flywire securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Flywire securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

78.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Flywire securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Flywire's finances and business prospects.

79.    By virtue of their positions at Flywire, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

80.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Flywire, the Individual Defendants had knowledge of the details of Flywire's internal affairs.

81.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Flywire. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Flywire's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Flywire securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Flywire's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Flywire securities at artificially inflated prices and relied upon the price of the securities,

the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

82.     During the Class Period, Flywire securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Flywire securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Flywire securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Flywire securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, the Individual Defendants participated in the operation and management of Flywire, and conducted and participated, directly and indirectly, in the conduct of Flywire's business affairs.  Because of their senior positions, they knew the adverse non-public information about Flywire's misstatement of income and expenses and false financial statements.

87.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Flywire's financial condition and results of operations, and to correct promptly any public statements issued by Flywire which had become materially false or misleading.

88.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Flywire disseminated in the marketplace during the Class Period concerning Flywire's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Flywire to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Flywire within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Flywire securities.

89.     Each of the Individual Defendants, therefore, acted as a controlling person of Flywire.  By reason of their senior management positions and/or being directors of Flywire, each of the Individual Defendants had the power to direct the actions of, and exercised the same to

cause, Flywire to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Flywire and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Flywire.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 25, 2025                    Respectfully submitted,

                                        POMERANTZ LLP

                                        */s/ Jeremy A. Lieberman*
                                        Jeremy A. Lieberman
                                        J. Alexander Hood II
                                        James M. LoPiano
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (917) 463-1044

jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.    I, Cole Hickman, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Flywire Corporation ("Flywire") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Flywire securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Flywire securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Flywire securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

Docusign Envelope ID: BBBD6ABA-773C-42B8-B516-14E5E29427AF

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** __4/29/2025_____
          **(Date)**

_____
                    **Cole Hickman**

**Flywire Corporation (FLYW)**                                          **Cole Hickman**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 2/24/2025 | 12 | $17.5000 |