**POMERANTZ LLP**
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Co-Lead Plaintiff Cole Hickman and Co-Lead Counsel for the Class*

**ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
philkim@rosenlegal.com
lrosen@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Co-Lead Plaintiff Jason Haas and Named Plaintiff Richard Butler and Co-Lead Counsel for the Class*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COLE HICKMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FLYWIRE CORPORATION, MICHAEL MASSARO, COSMIN PITIGOI and ROB ORGEL,<br><br>Defendants. | **Case No. 25-cv-04110**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. JURISDICTION AND VENUE .................................................................................... 4

III. PARTIES .................................................................................................... 5

A. Plaintiffs .................................................................................................... 5

B. Defendants .................................................................................................... 5

1. Corporate Defendant .................................................................................... 5

2. Individual Defendants .................................................................................... 5

IV. DEFENDANTS MISLED INVESTORS BY STATING THAT FLYWIRE'S 2025 PERFORMANCE IN CANADA AND AUSTRALIA WOULD NOT MATERIALLY DECLINE, WHEN IN FACT THEY KNEW IT WOULD .............................................. 6

A. Flywire's Business Depends to a Significant Degree on Canadian and Australian Student Enrollment .................................................................................... 6

B. Flywire's Canadian Education Market Is Cyclical Based on the Timing of Student Enrollments, So Revenues for the Coming Year Are Estimable by October ........ 8

C. Canada and Australia Imposed Visa Restrictions on International Students that Would Reduce Student Enrollment .................................................................... 9

D. Defendants Regularly Reviewed Student Enrollment and Revenue Metrics, Which Were Updated Daily .................................................................................... 9

E. Defendants Discussed the Impact of Canadian Visa Restrictions at Company-Wide Meetings .................................................................................... 12

F. Defendants Repeatedly Misled Investors by Stating that Canadian and Australian Visa Restrictions Would Not Cause 2025 Performance To Decline .................. 13

G. When Flywire Disclosed that Revenue in Canada and Australia Would Decrease by 30% Year-over-Year in 2025, Flywire's Shares Plummeted.......................... 23

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .................................................................................................... 27

VI. LOSS CAUSATION .................................................................................................... 30

VII. ADDITIONAL SCIENTER ALLEGATIONS .............................................................. 31

A. Defendants' Own Statements Show That They Focused on the Impact of Canadian and Australian Visa Restrictions on Flywire's Business ..................... 31

B. Core Operations ..................... 33

VIII. CLASS ACTION ALLEGATIONS ..................... 34

IX. COUNT ONE ..................... 36

X. COUNT TWO ..................... 39

XI. PRAYER FOR RELIEF ..................... 41

XII. JURY DEMAND ..................... 41

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **APAC** | Americas and Asia Pacific |
| **Class Period** | Between May 21, 2024 and February 25, 2025, both dates inclusive |
| **Company** | Flywire Corporation |
| **Defendants** | Flywire Corporation, Michael Massaro, Cosmin Pitigoi and Rob Orgel |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FE** | former employee |
| **Flywire** | Flywire Corporation |
| **FX** | foreign exchange |
| **GAAP** | generally accepted accounting principles |
| **Individual Defendants** | Michael Massaro, Cosmin Pitigoi and Rob Orgel |
| **Lead Plaintiffs or Plaintiffs** | Cole Hickman and Jason Haas |
| **PT** | price target |
| **RLAS** | revenue less ancillary services |
| **SaaS** | software-as-a-service |
| **SEC** | United States Securities and Exchange Commission |

Co-Lead Plaintiffs Cole Hickman and Jason Haas, and named plaintiff Richard Butler ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended complaint against Defendants Flywire Corporation ("Flywire" or the "Company"), Michael Massaro, Cosmin Pitigoi and Rob Orgel (with Flywire, "Defendants") alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Flywire Corporation, analysts' reports and advisories about the Company, interviews with former employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action (the "Action") on behalf of a class of persons and entities that purchased Flywire common stock between May 21, 2024 and February 25, 2025, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").[1] Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Flywire operates a payments platform in the U.S. and internationally that facilitates payments between clients and customers that specializes in enabling people to make cross-border

[1] Excluded from the class are Flywire and its officers and directors, their immediate family members and any entity over which an excluded person exercises control or owns more than 10%.

payments. Approximately 80% of Flywire's revenues come from processing tuition payments for universities and other educational institutions. Accordingly, Flywire's business is largely cyclical, tracking the academic calendar. Flywire's most important quarter is the third quarter of any year, including August and September, because most students enroll for the coming academic year in those months—by October Flywire can determine how many tuition payments it can expect to process for the coming academic year.

3. Approximately one quarter of Flywire's revenues come from the Canadian and Australian education markets. In January 2024, the Canadian government began announcing intake caps on international student permit applications. This policy dramatically reduced the number of international students who were permitted to attend university in Canada, and correspondingly reduced the number of international students using Flywire to make tuition payments. Likewise, beginning in late 2023 and continuing in 2024, the Australian government tightened international student visa rules through various measures.

4. During the Class Period, Defendant repeatedly misled investors about the impact of these visa restrictions on the number of students in these regions using Flywire's payment platform and about the corresponding impact on Flywire's revenues. In November and December 2024, even after Flywire had full information about how many students would be enrolling in the 2024-25 Canadian academic year, Defendants repeatedly stated that revenue in Canada in 2025 would be "flat" and that new business was effectively offsetting any losses from visa restrictions. In fact, as the Company later admitted, visa restrictions had so impacted international student enrollments in the 2024-25 academic year that in 2025, projected revenues dropped 30%.

5. Defendants likewise misled investors about the impact of Australia's visa restrictions on Flywire's revenues from that region. Defendants assured investors as early as May

and June 2024 that the contemplated Australian visa restrictions would not impact their revenue from Australia because they were focused on lower tier schools that were not Flywire clients. In fact, as the Company later admitted, Australia's visa restrictions had a significant effect on schools that were Flywire clients and decreased Flywire's projected revenues from that region by 30%.

6. Defendants knew that their statements were misleading. As multiple former employees have confirmed, Defendants had constant access to dashboards breaking down the Company's student payment counts and revenues by region. Defendants likewise discussed the impact of Canadian visa restrictions at company-wide meetings.

7. When Flywire finally revealed the true impact of the Canadian and Australian student visa restrictions on Flywire's business, its share price plummeted. On February 25, 2025, Flywire held a conference call with investors and analysts to discuss its Q4 and FY 2024 results. During the call, Defendant Pitigoi disclosed that Defendants "expect revenue in both [Canadian and Australian] markets to be down ***over 30%*** [Y/Y]" because "new visa rules are starting to affect demand."[2] Indeed, in its press release issued the same day announcing its fourth quarter and FY 2024 financial results, Flywire's CFO Defendant Pitigoi advised that "[f]or our 2025 financial outlook, we project [revenue] growth of 10-14%"—significantly less than low 20% range previously provided to investors.

8. On the same and the following day, multiple analysts downgraded their recommendation on Flywire and/or cut their price target ("PT") on the Company's stock, citing its poor Q4 and FY 2024 results. Multiple analysts also noted that Flywire's forecasted FY 2025 revenue, particularly with respect to the Canadian and Australian markets, was unexpected and stood in sharp contrast to Defendants' prior representations.

[2] All emphases in this complaint are added unless otherwise noted.

9. Following these disclosures and analyst downgrades and PT cuts, Flywire's voting common stock price fell $6.59 per share, or 37.36%, to close at $11.05 per share on February 26, 2025.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to Flywire's most recent quarterly report on Form 10-Q, as of May 1, 2025, the Company had 119,685,024 shares of its voting common stock outstanding. Flywire's voting common stock trades on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Flywire's securities located in the U.S., some of whom undoubtedly reside in this District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

15. Co-Lead Plaintiff Cole Hickman, as set forth in the certification attached as Exhibit C to the Declaration of J. Alexander Hood II (ECF No. 18-6), incorporated in this Complaint by reference, purchased Flywire common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Co-Lead Plaintiff Jason Haas, as set forth in his previously filed certification (ECF No. 17-3) and incorporated in this Complaint by reference, purchased Flywire common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17. Named Plaintiff Richard Butler, as set forth in the certification attached as **Exhibit 1** to this Second Amended Complaint, purchased Flywire common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B. Defendants

#### 1. Corporate Defendant

18. Defendant Flywire is a Delaware corporation with principal executive offices located at 141 Tremont Street #10, Boston, Massachusetts 02111. The Company's voting common stock trades in an efficient market on the NASDAQ under the ticker symbol "FLYW."

#### 2. Individual Defendants

19. Defendant Michael Massaro has served as Flywire's CEO at all relevant times.

20. Defendant Cosmin Pitigoi has served as Flywire's CFO since March 4, 2024.

21. Defendant Rob Orgel has served as Flywire's President and Chief Operating Officer ("COO") at all relevant times.

22. Defendants Massaro, Pitigoi and Orgel are collectively referred to herein as the "Individual Defendants."

23. The Individual Defendants possessed the power and authority to control the contents of their oral statements, Flywire's SEC filings, press releases and other market communications. The Individual Defendants were provided copies of Flywire's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

24. Flywire and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. DEFENDANTS MISLED INVESTORS BY STATING THAT FLYWIRE'S 2025 PERFORMANCE IN CANADA AND AUSTRALIA WOULD NOT MATERIALLY DECLINE, WHEN IN FACT THEY KNEW IT WOULD

### A. Flywire's Business Depends to a Significant Degree on Canadian and Australian Student Enrollment

25. Flywire, together with its subsidiaries, operates as a payments-enablement and software company in the U.S. and internationally that specializes in helping customer's make cross-border payments in their local currencies. The Company's payment platform and network, as well as its vertical-specific software, facilitate payments between clients and customers in a variety of industries.

26. Historically, Flywire's Americas and Asia Pacific ("APAC") markets have accounted for an outsized portion of the Company's revenues. For example, during the three months ended March 31, 2024, Americas and APAC clients accounted for 50.7% and 17.6% of the Company's total revenues, respectively, whereas during the same period in 2023, Americas and APAC clients accounted for 63.8% and 13.2% of the Company's total revenues, respectively. Likewise, during the three months ended June 30, 2024, Americas and APAC clients accounted

for 40.5% and 18.1% of the Company's total revenues, respectively, whereas during the same period in 2023, Americas and APAC clients accounted for 51% and 15.4% of the Company's total revenues, respectively.

27. In particular, the Canadian and Australian markets accounted for approximately 15% and 10%, respectively, of Flywire's revenues, and so together accounted for approximately 25% of Flywire's revenues in total, according to a former employee ("FE1") who was thoroughly versed in Flywire's' revenue sources. FE1 worked for Flywire as a Vice President of Revenue from August 2024 to April 2025 and reported to Chief Marketing Officer Allison MacLeod.

28. Flywire's largest vertical is education, which accounts for approximately 80% of the Company's revenue. That revenue relies on enrollment of international students in schools that use Flywire for cross-border payments. Accordingly, Flywire's business in the education industry is of particular importance to investors and analysts, especially the Company's Americas and APAC markets. To assess its financial performance in these markets, Flywire utilizes a number of non-GAAP[3] financial measures important to investors, including, *inter alia*, revenue less ancillary services ("RLAS") and foreign exchange ("FX") neutral RLAS. RLAS represents the Company's consolidated revenue in accordance with GAAP less pass-through cost for printing and mailing services and marketing fees, whereas FX neutral RLAS is RLAS adjusted to show presentation on a constant currency basis, thereby providing a comparable framework for assessing how the business performed excluding the effect of foreign currency fluctuations.

---

[3] "GAAP" refers to generally accepted accounting principles.

### B. Flywire's Canadian Education Market Is Cyclical Based on the Timing of Student Enrollments, So Revenues for the Coming Year Are Estimable by October

29. Canadian universities keep an academic calendar in line with those in the United States. Students enroll in and begin attending Canadian universities in August or September of a given academic year. Students pay their tuition prior to beginning classes, and so pay tuition for the fall semester of an academic year in August and September of that year. The vast majority of students who enroll in Canadian universities in August or September for the fall semester will also enroll in January for the spring semester of that academic year. Accordingly, Flywire's most important quarter of each year is the third quarter, which includes August and September, when most students make payments for the fall semester of that year. As the vast majority of students enroll in both the fall and spring semesters of an academic year, the number of student payments Flywire processes in August and September of a given year approximates the number of student payment Flywire will process at the start of the next year for the spring semester. Accordingly, each year, Flywire can reliably calculate its revenues for a full academic year by October of that year, at the latest.

30. A former employee ("FE2") has confirmed that Flywire's business is cyclical, such that Flywire can reliably calculate its revenues for an academic year by October. FE2 worked for Flywire as a Relationship Manager from May 2024 to March 2025. FE2 reported to Shelley Mancini, Director of Client Development for the East and Canada, who reported to Sharon Butler, EVP of Global Education, who reported to Chief Marketing Officer Allison MacLeod. According to FE2, students in Canada, including international students, enroll and begin paying tuition in August and September for the fall semester of an academic year. FE2 stated that by October of an academic year, most students who were going to enroll would already have done so. FE2 noted that some payments may continue to come in after August and September because some students

pay on payment plans, rather than in one lump sum, but, even so, Flywire would know by October, at the latest, the revenue outlook for the year.

### C. Canada and Australia Imposed Visa Restrictions on International Students that Would Reduce Student Enrollment

31. On January 22, 2024, the Canadian government announced that it would place intake caps on international student permit applications over the next two years and that, for 2024, the cap was expected to result in a 35% decrease in approved study permits in comparison to 2023. This reduced the number of international students coming to Canada, which resulted in a corresponding reduction in payment flows and an adverse effect on Flywire's business.

32. Likewise, beginning in late 2023, the Australian government tightened international student visa rules through various measures, which similarly had an adverse impact on the Company's business.

33. Notwithstanding the foregoing headwinds, at all relevant times, Defendants consistently touted the sustainability of Flywire's revenue growth and financial performance, while downplaying the anticipated negative impacts of permit- and visa-related headwinds on the Company's business.

### D. Defendants Regularly Reviewed Student Enrollment and Revenue Metrics, Which Were Updated Daily

34. Defendants knew the amount of tuition that Canadian students had paid through Flywire for the fall semester of the 2024-25 school year and that the number of students paying that tuition had materially decreased, and, therefore, that revenue from Canada would materially decrease in 2025, because Defendants regularly reviewed revenue and student count metrics. According to a former employee ("FE3"), Defendants monitored both student counts and the revenues being generated from those students. FE3 worked for Flywire as a Technical Account

Manager from June 2021 to March 2022 and then as a Product Manager at Flywire until October 2024. FE3 was one of two product managers in Flywire's education business.

35. According to FE3, the Company tracked shifts in revenue through internal payment metrics, which were available on dashboards. Reports from these metrics included granular data on which markets were generating payments and how volumes in those markets were changing. "We had it down by Canada for sure, and then by our clients in Canada," FE3 said. FE3 stated that the Company, including the Individual Defendants, monitored both student counts and revenues in individual markets. According to FE3, the C-suite, including the Individual Defendants, regularly reviewed these metrics in meetings and had constant access to them through the dashboards. "Those metrics were used as primary indicators of how we [we]re doing," FE3 stated.

36. Another former employee ("FE4") confirmed that Flywire's CEO and CFO had access to a dashboard tracking real-time revenue changes. FE4 worked for Flywire from January 2022 to September 2024 as a Vice President of Revenue. FE4's job concerned "global inbound and outbound payment flows" including a focus on "the education-linked payment corridors." FE4 agreed that Flywire maintained a dashboard that showed real-time updated revenues and that the CEO and CFO had access to this dashboard.

37. FE2 confirmed that Flywire constantly tracked the number of students using Flywire for payments and the Company's revenues. According to FE2, these metrics were tracked in a dashboard using a Google software tool. These metrics, including the number of students making payments and revenues, were updated "roughly every 24 hours." FE2 stated that the dashboard allowed Flywire employees to "consistently see how many students were processing their payments through Flywire."

38. Another former employee ("FE5") has also stated that Flywire held monthly forecast meetings in the travel vertical that included members of the C-suite, including the CFO, and that similar meetings were likely held for the education vertical. FE5 worked for Flywire as the Director of Sales for the travel vertical from 2024 to the end of October 2025. FE5 was responsible for growing revenue and for forecasting revenue each month and sending those forecasts to FE5's superiors. According to FE5, the education vertical likely held forecasting meetings with the C-Suite and CFO as well, given that the education vertical is more important to the Company than the travel vertical.

39. As noted above, Defendants knew by October 2024, at the latest, that materially fewer students making payments through Flywire had enrolled in Canadian schools in the 2024-25 school year, and accordingly, that revenue in 2025 from Canada would be materially less, because students enroll in Canadian schools in August or September of each year. FE2 confirmed that by October 2024 or earlier, Defendants knew how many students were enrolling in Canadian schools in 2024-25. As FE2 explained, most Canadian students enroll in August or September of each year, so by October at the latest, "they should have those numbers." FE2 stated that the C-suite (including Individual Defendants) "definitely" knew the enrollment numbers for Canadian students before November and December 2024, when they made their misleading statements alleged below. There was "no question in [FE2's] mind."

40. When asked about Defendants' misleading statements alleged below, including that revenue in Canada would be "flat" in 2025, FE2 stated that that statement did not match what employees were seeing throughout 2024. "It wasn't going to be flat," FE2 stated. The trend of decreasing Canadian revenue was "a constant downhill thing," that "wasn't going to get any better."

41. According to FE3, it was clear well before he left in October 2024 that fewer students were enrolling in Canadian schools for the 2024-25 school year—"when those restrictions went in place [in early 2024], fewer students were applying to Canada. [Fewer] students were sending money to Canada."

### E. Defendants Discussed the Impact of Canadian Visa Restrictions at Company-Wide Meetings

42. The impact from visa restrictions on student enrollments and revenue in the Canadian market was discussed at company-wide meetings led by Defendant Massaro, according to FE1. Indeed, FE3 stated that these impacts of the Canadian visa restrictions were discussed at Company-wide meetings with the CEO before FE3 left the Company in October 2024. FE3 stated, "they knew in the Canadian market the restrictions were going to have an impact on student headcount."

43. According to FE2, the fact that revenue in Canada was declining was also regularly discussed at all-hands sales meetings, including meetings in September and October 2024. At these meetings, the Company's Chief Marketing Officer, Allison MacLeod would talk about the decline in Canadian revenue and "how important it was for the clients in the states to be making up what was being lost in Canada." FE2 stated that MacLeod "100 percent" discussed the decline in Canadian revenue at all-hands meetings in September and October 2024. The decline in Canadian revenue was also discussed in formal monthly sales calls. FE2 explained that if information about the ongoing decline in Canadian revenue was reaching "me, kind of the small fry person," then that information had to be well known at senior levels, which were pressuring FE2 and FE2's colleagues to make up for the decline.

### F. Defendants Repeatedly Misled Investors by Stating that Canadian and Australian Visa Restrictions Would Not Cause 2025 Performance To Decline

44. From the start of the Class Period, Defendants repeatedly misled investors to believe that restrictions on student visas in Canada and Australia would not cause Flywire's revenues from those regions to decrease year-over-year in 2025.

45. Defendants misleadingly stated that they expected revenue from Canada to be flat year-over-year from 2024 to 2025 even after they were aware of a material drop in student enrollment for the 2024-25 academic year that would lead to a corresponding material decrease in revenue in 2025.

46. Regarding Australia, Defendants repeatedly stated that the country's new visa regulations only affected lower tier universities that would have, at most, a small impact on Flywire's revenue.

47. Flywire shocked investors when it announced on February 25, 2025, contrary to Defendants' earlier statements, that the revenue from both the Canadian and Australian markets would fall 30% year-over-year.

48. These statements were all the more misleading in the context of numerous additional statements by Defendants and Flywire that downplayed the impact of the Canadian and Australian visa restrictions.

49. On May 11, 2024, Australia's Minister of the Education issued a media release stating that the following week the government would introduce legislation that would "enable the Minister for Education to set an allocation for the maximum number of new international student enrolments education providers can offer." It further stated that "[t]he Government will work with international education providers to limit the number of international students that can be enrolled over a particular period of time" and that "[i]f universities want to enrol international students

above that limit, they will be required to establish additional, new supply of purpose-built student accommodation to benefit both international and domestic students and free up pressure on the rental market."

50. In tandem with the May 11 media release, the Australian government released the "International Education and Skills Strategic Framework." The Strategic Framework stated that the Australian government's proposed international student caps would "apply *across higher education* and [Vocational Educational and Training]."

51. The Class Period begins on May 21, 2024, when Defendant Massaro appeared for a public interview with the research analyst Tien-Tsin Huang of JPMorgan Chase & Co. at the J.P. Morgan Technology, Media & Communications Conference. In this interview, despite the Australian government's May 11, 2024 announcement, Defendant Massaro directly stated that Australia's new visa restrictions would not materially impact Flywire because they only affected "Tier 3 or Tier 4 type universities." Huang asked, "Are there any other regions or reg changes that are on the radar for you?" Massaro responded in relevant part:

> In Australia, they're also addressing what are, I would say, Tier 3 or Tier 4 type universities who are issuing visas to folks for short-term educational stints, and they're addressing that with new regulation, *that doesn't really impact Flywire much*, not really our target demographic of university or school in that sector in Australia.
>
> And so you've got a big election year happening all around the world, and you have obviously immigration and policy being a big headline grabber. I think for us, we've seen that type of trend over the last decade plus. *And again, we typically see it as more headlines than it is actual real impact.* I guess some people could say foreign governments may like the headlines or hit the headlines during election season, but oftentimes, they don't follow through as aggressively as the headlines sometimes say.

52. In fact, Australian visa restrictions targeted Flywire's business to such an extent that it caused a decrease in Flywire's projected revenue from Australia of over 30% in 2025.

53. Earlier in his statements, Defendant Massaro downplayed the impact of Canadian visa restrictions on the Company's financial prospects going forward and claimed to have incorporated that impact into their financial projections.

> *So the good news in Canada is the visas are now known.* The permit numbers are known on a per university basis. And what we've said is expect kind of this rolling recovery of admissions in Canada for the remainder of the year. And so we've adjusted our Q2 guide for that and the full year, we've kept intact outside of FX.
>
> [. . .]
>
> [N]ow that there's clarity, we obviously see the payment volume coming back, and *we are seeing that rolling recovery, which is what we expected*. You can also, I think, look, for us, we look at our clients and what they say on the ground, right? And there's a strong belief both our clients and from the educational agents that help students apply to Canada that both of those audiences believe that those seats will be filled, right? These are too critical of a revenue stream for universities up in Canada and throughout in Q2, Q3 and Q4, you'll see a progressing of that admission process to the point where they expect to use their full allocations this year.

54. Next month, on June 5, 2024, at the William Blair Growth Conference, Defendant Massaro again misled investors to believe that contemplated restrictions on Australian visas would not have a material impact on Flywire's business. In a dialogue with Defendant Massaro, Cris Kennedy asked "You mentioned, you alluded to it, UK and Australia, similar type of headlines—what are you guys seeing over there? Defendant Massaro stated:

> So headlines in Australia that you mentioned are focused on, I would say, much more lower tier educational programs, where people are using those lower tier educational programs to get a visa to enter a country, and then they're typically staying and not really for education purposes. That's not really Flywire's clientele. So *the headlines you see in a place like Australia doesn't have material impact to our business*.

55. At the same conference, Defendant Massaro downplayed the impact of Canadian visa restrictions on Flywire's business, stating that the visa policies had "lightened" and that there was a "rolling recovery of student visas issued in Canada":

> We'[ve] distributed some revenue from Q2 into the second half of the year, as those *student visa policies have*, I would say, *lightened in the last few weeks and have started to roll again*. And so *we expect that remaining guide for the year to*

> *continue to be on track to see that rolling recovery of student visas issued in Canada*.

56. On August 27, 2024, the Australian Minister for Education followed up on its May 11, 2024 announcement by issuing a media release stating that "subject to the passage of legislation before the Parliament, it will set a National Planning Level (NPL) for new international student commencements of 270,000 for calendar year 2025" and it will be "divided between the higher education and vocational education and training (VET) sectors." According to the government, 145,000 of those slots would be allocated to publicly funded universities, 30,000 would be allocated for other universities and non-university providers, and that 95,000 would be allocated to the VET sector. It further stated this would "bring the number of new international student commencements, across higher education and VET, back to pre-pandemic levels."

57. The Australian government's August 27, 2024 announcement further stated that international student limits for each individual university would be outlined in an "International Student Profile" or "ISP" and that publicly funded universities had been provided with their "indicative ISPs."

58. On September 11, 2024, at the Goldman Sachs Communacopia + Technology Conference, Defendant Pitigoi was interviewed by William Alfred Nance, a research analyst from Goldman Sachs Group, Inc. Nance asked Defendant Pitigoi about how confident Flywire was that it had captured the impact of Canada's student visa program on Flywire: "do you feel like the guidance is appropriately capturing the dynamics in Canada?"

59. Defendant Pitigoi flatly responded "yes" and continued to downplay the potential impact of Canada's visa restrictions:

> *The short answer is yes* . . . . [T]his is a reset year for Canada. And we can now start to build on top of that and say, look this is kind of the second half exit growth rate. Those are the dynamics that already are pretty well captured. And so *we feel good that, that's captured in what we've provided as far as the guidance there*.

60. In the same statement, Defendant Pitigoi explained to investors that the Company would know for sure the impact of the Canadian visa restrictions on Canadian student enrollment and Flywire revenue by the end of the third quarter, because tuition payments for the 2024-25 school year are due by the end of the third quarter (the end of September 2024). Pitigoi stated:

> Q3 is our education peak, and it's U.S. and U.K. kind of playing out mostly in August and September. [. . .] The way to think about it is the last day of the quarter happens to also be the last day of tuition. But we've gotten better and better at kind of predicting what that looks like. We'll have to see, obviously. We'll—we have kind of the peak period coming through. And so we'll wait to play that out. But again, we feel like we've captured that within the range that we've provided.

61. These statements gave investors the impression that Flywire had reasonable grounds to believe that the Company could estimate the impact of the Canadian visa restrictions and had already incorporated that impact into its statements, and that in any event, Flywire would know for certain the full impact of the Canadian visa restrictions by the end of September 2024.

62. At the same conference, Defendant Pitigoi addressed Australian visa restrictions, and again assured investors that those restrictions would not impact Flywire because the restrictions concerned visas for trade schools, whereas Flywire's clients are mostly traditional schools of higher education. Defendant Pitigoi stated:

> In Australia, what they're pushing on is sort of immigration and it's especially immigration that—from folks who are coming in through those kind of vocational and trade schools. And so what you saw last week, what they announced in their kind of new Visa proposals. So one, the focus is on kind of limiting the students coming into those more the vocational trade schools, while they're still allowing kind of the higher education kind of traditional type of opportunities. So that's—the good news for us there is that most of our volume is from those higher education traditional schools. It's less from the vocational kind of trade schools dynamic. So that's good news #1. Good news #2 is that at least we know now, and we have the numbers . . . .

63. Two days later, on September 13, 2024, at the Autonomous Future of Commerce Symposium, Defendant Pitigoi again assured investors that the worst of the impact of Canada's

visa restrictions was now behind Flywire and Flywire had already accounted for the potential impact in its financial performance:

> So Q1 was really tough. That's when everything sort of stopped in Canada. Q2, we saw a bit of recovery and just not as much as we expected. And *then you can see Q3, Q4 relatively flat after that*. [. . .] Then the only piece that they're still discussing right now is the postgraduate study permits, which is—but that's kind of a smaller part of the business and *we've already kind of accounted for most of that in our numbers already*.
>
> [. . ]
>
> In Canada, they're—so what they've done is they've allowed graduate students to stay, something—sometimes longer term. And what we've seen earlier this year is that they announced some reduction in that. *We've already accounted for that in what we've given as guidance*.
>
> [. . ]
>
> [A]gain, *within this year, it's captured in our numbers*. And *for next year, again, it's a smaller impact in the short-term*.

64. Defendant Pitigoi addressed Australian visa restrictions at the same conference and continued to assure investors that Flywire had "visibility" into the impact on Flywire's business and that the impact would be minimal given that, according to Pitigoi, the restrictions mostly affected visas for vocational training.

> [Visa restrictions are] really meant to cap some of the number of students coming into the country. But really at the sort of the traditional vocational side, not so much in the higher education. And from our standpoint, one is I love the fact that *we actually have visibility now as opposed to surprising us later,* so that's actually good news. Second, it is that it's focused actually on those tier kind of educational opportunities, whereas our business leans more towards the higher education tier, and that's where we play mostly. And so *less of an impact from that perspective*.
>
> The other thing to consider is even within that higher ed, there's public and private schools, our mix also leans more towards public within that higher ed mix.

65. On September 18, 2024, the Canadian government announced a further reduction in the intake cap on international student study permits for 2025, which it expected to result in a 10% decrease in approved study permits in comparison to 2024.

66. A couple months later, on November 7, 2024, Defendants held their Q3 2024 earnings call with investors. At this point, as Defendant Pitigoi had explained to investors just two months prior, the tuition payments for the 2024-25 Canadian school year had been processed, and student enrollments in August and September had finished. Accordingly, at this point, Defendants knew fully well that student counts for the 2024-25 academic year had materially dropped, and that the revenues Flywire could expect in 2025 from Canadian students likewise had materially dropped by more than 30%. Nevertheless, Defendant Orgel flatly lied to investors and assured them that, based on their information, revenues from Canada in 2025 would not decrease but would instead remain flat:

> In the absence of better news that builds demonstrated momentum with student volumes, *we are preparing for 2025 revenue in Canada to be relatively flat with 2024*.

67. In this way, Defendant Orgel flatly misled investors about the information from student counts and revenues for the 2024-25 academic year that was already in his possession at the time he made this misstatement.

68. On the same call, Orgel further stated that "[t]here are headlines about caps and immigration policy emerging from Australia as well. [. . .] Yet we are seeing *early moderation in the revenue growth rate*, and *we are watching Australian developments closely*."

69. On the call, Defendants Massaro and Pitigoi also spoke and suggested that investors should consider Flywire a "Rule of 40" company. The "Rule of 40" is a financial benchmark used to determine the value prospect of investing in software-as-a-service ("SaaS") companies, which states that, at scale, the sum of the company's revenue growth rate and profit margin should exceed 40% for healthy SaaS companies. Defendant Massaro stated that the Company's revenue growth in 2024 was 26%, and Defendant Pitigoi stated that their profit margin (EBITDA margin) was 16% in 2024, so given the sum of these percentages (26% and 16% sum to 42%), Flywire was a Rule

of 40 company in 2024. Yet Defendants baselessly assured investors that they had reason to believe that Flywire would continue to be a Rule of 40 company "long term" in 2025 as well.

70. Defendant Massaro stated:

> [A]gain, we think we're building a pretty great company here with strong Rule of 40 growth and profitability, and that's what we expect for the future.

71. Defendant Pitigoi stated:

> So the way to think about—as we look at next year, first, as I said, look*, long term, Rule of 40* and continuing to drive strong revenue growth . . . . Then as you look at next in terms of margin, margin this year, just to clarify, adjusted *EBITDA margin is 16%*. And we've said historically that we're going to grow 300 to 600 bps. As you look into next year, we feel comfortable as usual, kind of starting at the low end of that . . . . So overall, *feel good about that Rule of 40*. Obviously, we're well in that even this year with an 8-point headwind.

72. In assuring investors that Flywire was a Rule of 40 company based on revenue growth of 26% and EBITDA margins of 16%, and that Flywire would remain a Rule of 40 company in 2025, Defendants implied that they had no reason to think that Flywire's revenue would sink by more than 3%. In fact, Defendants knew at this time based on student counts in Canada and Australia that revenue growth from Canada and Australia would decrease materially, by 30%, which would decrease Flywire's revenue growth by 12-16% (to 10-14%) for 2025.

73. On November 8, 2024, the Canadian government announced that it was ending the Student Direct Stream ("SDS") and Nigeria Student Express ("NSE") programs that had allowed international students from certain countries to receive faster study permit processing if the student, among other things, showed that he or she had already fully paid the first year of tuition at a Canadian educational institution.

74. A little less than two weeks later, on November 19, 2024, Defendant Pitigoi spoke at the Stephens Annual Investment Conference. Despite the discontinuation of SDS, Pitigoi again stated that Flywire's revenues from Canada would remain flat in 2025.

> *[W]hat we've said for next year is that Canada revenue will be probably flat year-over-year*, as I think we still have some of these, kind of dynamics to work through. But obviously, we have our own sort of growth and existing clients and continuing to cross-sell that's offsetting some of these pressures. But sort of *revenue year-over-year, roughly flat, is kind of what we've said*.

75. In fact, Defendant Pitigoi knew perfectly well at this point that student counts for the 2024-25 academic year in Canada had plummeted, and that revenue for Canada in 2025 was projected to materially decrease, by over 30%.

76. At the same conference, Defendant Pitigoi reiterated Defendants' prior statements that Flywire will continue to be a Rule of 40 company in 2025, and so wrongly implied that Defendant Pitigoi had no reason to believe that Flywire's revenue growth would not drop by more than 3%:

> [W]e wanted to make sure that we set sort of a line in the sand around our expectations on margins and rule of 40. So again, we've said that we can, we—we've been a rule of 40 company, even this year, by the way at the midpoint of our guide, we're in that rule of 40 bucket. And so with that *looking ahead, we've said we can—we believe we'll continue to be a rule of 40 company*.

77. On December 3, 2024, at the UBS Global Technology and AI Conference, Defendant Pitigoi once again indicated that he had a reasonable basis to believe that revenue in Canada would be flat in 2025, when by this point, Defendant Pitigoi was well aware that the student counts, and with them expected revenue in Canada for 2025, had plummeted by over 30%:

> So in Canada, just to sort of break that down a little bit because that was about a $30 million headwind for us this year from Canada alone. So even growing at sort of in the mid-20s plus like we have in our guidance, that is despite this $30 million headwind in the year. And *what we've guided for next year for Canada*, given some of these dynamics *is basically roughly flat revenue*. And so let me walk through the dynamics there.

78. During the same statement, Pitigoi explained that Canada had already clarified what the international student caps would be and that the clarification was "a positive":

> So on the one hand, we continue to add clients. We continue to ramp up new clients, cross-sell in Canada. So that is good solid growth that the team is continuing to build despite some of the challenges that the educational institutions are having there. Now offsetting that is this sort of immigration focus where there's two

> dynamics. There's the supply and there's the demand side dynamic that you've heard. *So the supply side is the caps that they've put on international students. That was clarified earlier and actually as a positive. At least I think everyone now knows what the caps are, so that we're not guessing at what that is.* That was part of the challenge coming into the year is what is Canada going to put as caps.

79. Pitigoi concluded his statement by saying that, although there was a decrease in demand for Canadian higher education among international students due to Canada's student intakes caps, it was being offset by the addition of new Flywire clients:

> [W]e felt prudent as far as looking at revenue for next year to say, look, you're going to have these pressures, both on the supply and demand side in terms of students going to Canada right now. *But offsetting that, we have, again, the team is doing a great job adding new clients, ramping new products and capabilities in the market. So those two things sort of offset at the moment.*

80. On December 19, 2024, the Australian government announced that because of the Australian Liberal Party's decision to oppose the international student cap legislation that the government originally proposed on May 11, 2024, the Labor Party government would instead accomplish the same goal of "ensur[ing] international student numbers can be properly managed while making the system fairer through changes to visa processing prioritisation." To implement this, the government issued Ministerial Direction 111, effective immediately.

81. To limit the number of incoming international students, the government established two categories of student visa processing: "high priority" and "standard priority." All international education providers would receive high priority processing for up to 80% of the international student cap that they would have had under the legislation first proposed on May 11, 2024. After an international education provider reached 80% of their cap, their students would receive only standard priority processing, which created a significant deterrent to additional international students enrolling.

82. Accordingly, through Ministerial Direction 111, the Australian government was able to, in effect, impose the international student cap it first proposed on May 11, 2024. Furthermore, it would soon become evident that, contrary to Defendants' repeated statements, these changes had a material effect on Flywire's business.

### G. When Flywire Disclosed that Revenue in Canada and Australia Would Decrease by 30% Year-over-Year in 2025, Flywire's Shares Plummeted

83. On February 25, 2025, during after-market hours, Flywire issued a press release announcing its Q4 and FY 2024 financial results (the "Q4/FY 2024 Earnings Release"). For Q4 2024, the Company reported a loss per share of $0.12, missing consensus estimates by $0.12, and revenue of $117.6 million, missing consensus estimates by $1.25 million. Defendant Massaro, as quoted in the same press release, blamed these disappointing results on "a complex macro environment with significant headwinds" and disclosed that the Company "will be undertaking an operational and business portfolio review" and certain "efficiency measures" including "a restructuring, which impacts approximately 10% of our workforce."

84. Further, Defendant Pitigoi, as quoted in the Q4/FY 2024 Earnings Release, advised that, "[f]or our 2025 financial outlook, we project [RLAS] growth of 10-14% on an FX-neutral (constant currency) basis"—significantly less than "the low 20s . . . plus" figure he provided only a quarter ago during the Q3 2024 Earnings Call.

85. The same day, also during after-market hours, Flywire hosted a conference call with investors and analysts to discuss its Q4 and FY 2024 results (the "Q4/FY 2024 Earnings Call"). During that call, Defendant Pitigoi further explained that revenue from Canada had fallen short of the expectation by $3 million in the fourth quarter:

> Revenue less ancillary services was $112.8 million in Q4, representing a 17.4% year-over-year growth rate. This was lower than our guidance midpoint by approximately $8 million primarily driven by Canada and FX. Canadian higher

> education alone was down over 50% year-over-year, resulting in a nine percentage points headwind to growth this quarter. [. . .] [N]ew policy changes added to the previous restrictions caused our revenue in Canada to fall short of our expectations by $3 million….

86. Then, later in his remarks, Defendant Pitigoi made the shocking admission that, even though Canada higher education was already down 50% year-over-year between 2023 and 2024 and Defendants had previously stated that Canadian revenue would be flat between 2024 and 2025 and that Australian Visa regulations would have little impact on Flywire, Defendants "***expect revenue in both [Canadian and Australian] markets to be down over 30% [Y/Y]***" because "new visa rules are starting to affect demand."

87. Later during the question and answer portion of the Q4/FY 2024 Earnings Call, Andrew Schmidt from Citibank noted Defendants' previous statements that Canada would be flat year-over-year between 2024 and 2025, asked whether the Company could "strip out what's SDS versus what's perhaps underlying visa impact," and raised the point that SDS's elimination might not be that significant because it only concerned the timing of the tuition payments, not whether it would be paid at all:

> And then maybe if I could ask about Canada. I think the previous assumption was for flat in 2025 and obviously there's the SDS impact. Could you maybe just strip out what's SDS versus what's perhaps underlying visa impact, if that's possible? And then just to be clear, correct me if I'm wrong, SDS could be timing, meaning that once you kind of flow through this, the revenues normalized based on the timing of the payments, meaning less accelerated, more typical payment schedule. Any help there would be great. Thank you so much.

88. Defendant Orgel responded by explaining that the "fundamental challenge in Canada" was "demand destruction":

> *So the fundamental challenge in Canada is that they've had this significant demand destruction, right*. So, there's really two things going on. There's the fees of caps and the published limits. There's the change in the policy, which may affect the full first year payments. *But the other thing going on is that they're not achieving the level of enrollments that equate to their caps, and that's because of the demand*

> *destruction that's happened there*. So if you look at sort of what this means for Flywire, we have the effect of the total number of students. You might think of that as being sort of the top of funnel for what we can view as our opportunity to capture payments, and that's what's been fundamentally affected. And then we offset that with the success of our team and our execution in Canada.

89. Between after-market hours on February 25, 2025 and pre-market hours on February 26, 2025, multiple analysts downgraded their recommendation on Flywire and/or cut their PT for its stock based on the Company's disclosure that revenue from Canada and Australia would be down 30%.

90. For example, Deutsche Bank downgraded Flywire to a "hold" from "buy" recommendation and its PT on the Company's stock to $16.00 from $26.00, implying a 9.3% decrease from Flywire's last closing price. Deutsche Bank stated that Flywire's FY 2025 forecast of approximately 12% constant-currency revenue growth at the midpoint was "disappointing" and "sharply contrasted with mgmt.'s commentary on the 3Q24 earnings call and at public conferences in Dec[ember] where the company pointed to low-20s growth/Rule of 40[.]" Deutsche Bank further stated that "[t]he main drivers of the weak guide were the usual suspects, namely Canada and Australia, where revenue growth is now expected to decline -30% Y/Y vs prior expectations for flat Y/Y growth in Canada and growth 'below company avg.'"

91. Similarly, BTIG downgraded Flywire to a "neutral" from "buy" recommendation, citing headwinds for Canada and Australia that were "worse than feared." BTIG stated that "[e]ven if FY25 guidance that missed Street estimates by a long shot is baking in a worst-case scenario, we do not see how investors can gain any confidence in the company's top-line growth algorithm until it strings together a few quarters of consistency[.]"

92. Goldman Sachs downgraded Flywire to a "neutral" from "buy" recommendation, as well as set a $15.00 PT on the Company's stock, implying a 15% decrease from its last closing

price. Goldman Sachs called Flywire's "guidance . . . disappointing, with the company guiding roughly 10% below consensus at the midpoint[.]" Goldman Sachs further observed that, "[w]hile we had expected weaker than consensus guidance as a function of FX, the company is now anticipating a 30% decline in CAD/AUS cross border education revenues in 2026, from its prior expectation of flat Canada, and is also baking in incremental pressure in the U.S. following a decline in student visa issuance more recently."

93. Various other analysts similarly reacted negatively, with Raymond James downgrading Flywire to an "outperform" from "strong buy" recommendation and cutting its PT on the Company's stock to $17.00 from $29.00, noting that Flywire's FY 2025 constant-currency revenue guidance was "well below even the most bearish expectations"; UBS downgrading Flywire to a "neutral" from "buy" recommendation and cutting its PT on the Company's stock to $15.00 from $25.00, citing "[c]ontinued demand pressure in core four education markets weighing on [RLAS] growth"; Morgan Stanley cutting its PT to $15.00 from $21.00 and likewise calling the Company's results "disappointing"; and Stephens downgrading Flywire to an "equal-weight" from "overweight" recommendation while also setting a $15.00 PT on the Company's stock.

94. Following the Q4/FY 2024 Earnings Release and Call, as well as the foregoing analyst downgrades and PT cuts, Flywire's voting common stock price fell $6.59 per share, or 37.36%, to close at $11.05 per share on February 26, 2025.

95. On March 5, 2025, about a week after the Q4/FY 2024 Earnings Call, Defendant Pitigoi further discussed destruction of the demand for student visas in the Canadian market at the Morgan Stanley US Technology, Media & Telecom Conference, and admitted that it occurred due to Canada's caps on student permits at the beginning of 2024:

> And while we saw exiting Q4, the assumption was that maybe that demand destruction that started sort of early in the year where Canada put caps in place. We

> obviously have a lot of cross border business there. The student caps was starting to already sort of destroy demand. The rhetoric kind of from the government was such that you saw demand destruction happening exiting the year.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

96. On May 21, 2024, at the J.P. Morgan Technology, Media & Communications Conference, Defendant Massaro stated:

> In Australia, they're also addressing what are, I would say, Tier 3 or Tier 4 type universities who are issuing visas to folks for short-term educational stints, and they're addressing that with new regulation, *that doesn't really impact Flywire much*, not really our target demographic of university or school in that sector in Australia.
>
> And so you've got a big election year happening all around the world, and you have obviously immigration and policy being a big headline grabber. I think for us, we've seen that type of trend over the last decade plus. And again, *we typically see it as more headlines than it is actual real impact*.

97. This statement was materially false and misleading because Australia's new visa policies did not impact student enrollments in only Tier 3 and 4 universities, but also materially impacted student enrollments at traditional universities, so those visa policies did "really impact" and have an "actual real impact" on Flywire's business.

98. On June 5, 2024, at the William Blair Growth Conference, in response to the question from analyst Cris Kennedy, "You alluded to . . . Australia, similar type of headlines, what are you guys seeing over there?," Defendant Massaro stated:

> So there's all types of headlines. [. . .] So headlines in Australia that you mentioned are focused on, I would say, much more lower tier educational programs, where people are using those lower tier educational programs to get a visa to enter a country, and then they're typically staying and not really for education purposes. That's not really Flywire's clientele. *So the headlines you see in a place like Australia doesn't have material impact to our business*.

99. This statement was materially false and misleading because Australia's new visa policies did not impact student enrollments in only Tier 3 and 4 universities, but also materially

impacted student enrollments at traditional universities, so those visa policies did have a "material impact" on Flywire's business.

100. On November 7, 2024, Flywire issued a press release announcing its third quarter ("Q3") 2024 financial results. The press release quoted Defendant Pitigoi as stating, in relevant part: "*Flywire has been and expects to continue to be a Rule of 40 company . . . .*"

101. This statements was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students, had materially decreased from the prior year due to visa restrictions to such an extent that Flywire would not "continue to be a Rule of 40 company" in 2025.

102. Also on November 7, 2024, Flywire hosted a conference call with investors and analysts to discuss its Q3 2024 results and expectations for Q4 and FY 2024 (the "Q3 2024 Earnings Call"). On the call, Defendant Orgel stated:

> [W]e are taking a long view on Canada and continue to work hard to serve existing clients, expand our client footprint by winning more Canadian institutions and expand our product footprint in that market. *In the absence of better news that builds demonstrated momentum with student volumes, we are preparing for 2025 revenue in Canada to be relatively flat with 2024.*

103. This statement was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students would materially decreased in 2025 from the prior year because most students who enroll in the spring semester were enrolled for the fall semester and so, therefore, knew that revenue from Canada would not be "relatively flat" with 2024.

104. On the Q3 2024 Earnings Call, Defendant Massaro stated:

> [A]gain, we think we're building a pretty great company here with strong Rule of 40 growth and profitability, and that's what we expect for the future.

105. This statement was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students, had materially decreased from the prior year due to visa restrictions to such an extent that Flywire would not continue to be a Rule of 40 company in 2025.

106. On the Q3 2024 Earnings Call, Defendant Pitigoi stated:

> So the way to think about—as we look at next year, first, as I said, look*, long term, Rule of 40* and continuing to drive strong revenue growth . . . . [O]verall, *feel good about that Rule of 40*.

107. This statement was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students, had materially decreased from the prior year due to visa restrictions to such an extent that Flywire would not continue to be a Rule of 40 company in 2025.

108. On November 19, 2024, at the Stephens Annual Investment Conference, Defendant Pitigoi stated:

> So that's why what we've said for next year is that *Canada revenue will be probably flat year-over-year*, as I think we still have some of these, kind of dynamics to work through. But obviously, we have our own sort of growth and existing clients and continuing to cross-sell that's offsetting some of these pressures. But sort of *revenue year-over-year, roughly flat, is kind of what we've said*.

109. This statement was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid

for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students would materially decreased in 2025 from the prior year because most students who enroll in the spring semester were enrolled for the fall semester and so, therefore, knew that revenue from Canada would not be "roughly flat" with 2024.

110. On December 3, 2024, at the UBS Global Technology and AI Conference, Defendant Pitigoi stated:

> So in Canada, . . . that was about a $30 million headwind for us this year from Canada alone. So even growing at sort of in the mid-20s plus like we have in our guidance, that is despite this $30 million headwind in the year. *And what we've guided for next year for Canada, given some of these dynamics is basically roughly flat revenue.*
>
> [. . .]
>
> [W]e felt prudent as far as looking at revenue for next year to say, look, you're going to have these pressures, both on the supply and demand side in terms of students going to Canada right now. *But offsetting that, we have, again, the team is doing a great job adding new clients, ramping new products and capabilities in the market. So those 2 things sort of offset at the moment.*

111. This statement was materially false and misleading because Defendants knew the number of Canadian students who paid tuition through Flywire and the amount of tuition they paid for the fall semester of the 2024-25 school year at the time this statement was made, and, correspondingly, that revenue from Canadian students would materially decreased in 2025 from the prior year because most students who enroll in the spring semester were enrolled for the fall semester and so, therefore, knew that revenue from Canada would not be "basically roughly flat" with 2024 and Flywire was not "offset[ting]" the revenue loss from Canada's student visa policies "at the moment."

## VI. LOSS CAUSATION

112. Defendants' false and misleading statements artificially inflated the price of Flywire common stock during the Class Period. The Class suffered losses on February 26, 2025

after Flywire revealed that it had misled investors through these misstatements and the artificial inflation in the price of its stock dissipated.

113. As detailed in Paragraphs 83-94 above, on February 25, 2025, during after-market hours, Flywire issued a press release and held an investor conference call concerning the Company's full-year and fourth quarter earnings for 2024. Based on these disclosures, analysts downgraded their valuations of Flywire.

114. Following the disastrous news announced in the February 25, 2025 Earnings Release and Call, as well as the analyst downgrades and PT cuts, Flywire's voting common stock price fell $6.59 per share, or 37.36%, to close at $11.05 per share on February 26, 2025 on unusually heavy trading.

115. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendants' Own Statements Show That They Focused on the Impact of Canadian and Australian Visa Restrictions on Flywire's Business

116. Defendants' statements themselves show that they were keenly focused on the impact of Canadian and Australian Visa restrictions throughout the Class Period. Notwithstanding these issues, Defendants touted the strength and sustainability of Flywire's revenue growth, while downplaying the negative impact that the headwinds from the Visa restrictions were having, and would continue to have, on the Company's business.

117. Defendant Pitigoi served as Flywire's CFO during the entire Class Period and was, therefore, responsible for monitoring the Company's revenue and preparing its financial

statements. Furthermore, Pitigoi's own statements show that he was closely monitoring revenue from Canada and Australia.

118. Regarding Canada, in September 2024, Pitigoi twice stated in response to skeptical questions from analysts that the impact of Canada's student visa restrictions were captured by Flywire's guidance and further explained that *he would know for sure what the impact of Canadian visa restrictions would be by the end of September 2024 (the end of the third quarter) because that was when tuition was due for the 2024-25 school year* (*see* Paragraphs 58-60, 63). Then, in November and December of 2024, long after the end-of-September deadline for tuition had passed, Pitigoi represented to investors that Canadian revenue would be flat year-over-year in 2025 (*see* Paragraphs 74, 77), that Flywire was successfully offsetting pressure on both "the supply and demand side in terms of students going to Canada" (Paragraph 79), and that Flywire would remain a Rule of 40 Company (*see* Paragraph 71, 76).

119. Regarding Australia, Pitigoi reassured investors on September 11, 2024 that Australian visa restrictions would not impact Flywire because the restrictions concerned visas for trade schools, whereas Flywire's clients are mostly traditional schools of higher education (*see* Paragraph 62). He made a similar statement at another conference two days later where he further explained that "*we actually have visibility now as opposed to surprising us later*" regarding the effects of visa restrictions on the Australian market (*see* Paragraph 64).

120. Defendant Orgel also spoke in detail about the Canadian and Australian markets, indicating that he was following them closely. During Flywire's Q2 2024 earnings call on August 6, 2024, he said the Company remained optimistic about Canada and this was a "unique year." He further explained that he was knowledgeable about Canada because he had "been in Canada" and "spent time" with Flywire's clients there. During Flywire's Q3 2024 earnings call on November

7, 2024, Orgel was tasked with updating investors about the Canadian and Australian markets. He misleadingly told investors that "[i]n the absence of better news . . . revenue in Canada [will] be relatively flat with 2024." (*See* Paragraph 66). He further stated that he was watching "Australian developments closely." (*See* Paragraph 68).

121. Defendant Massaro's statements also showed that he was closely monitoring and knowledgeable about the visa restrictions in Australia and Canada. During the May 21, 2024 J.P. Morgan Technology, Media & Communications Conference and June 5, 2024 William Blair Growth Conference, Massaro spoke in detail about how the new Australian visa regulations would not have an impact on Flywire's revenue from Australia because they targeted lower tier schools that were not Flywire clients (*see* Paragraphs 51, 54). Defendant Massaro was, at minimum, reckless when he made such definitive statements to investors concerning the impact that Australia's visa restrictions would have on Flywire's revenue.

122. Massaro, likewise, spoke in detail about the Canadian visa restrictions during those conferences, explaining that "[t]he permit numbers are [now] known on a per university basis" and "we are seeing that rolling recovery, which is what we expected" during the J.P. Morgan Technology Conference (*see* Paragraph 53). During the William Blair Conference, he stated that Canada's "visa policies have . . . lightened in the last few weeks" and reiterated that Canda was on track for a "rolling recovery" (*see* Paragraph 55).

123. Later on November 7, 2024, during the Company's Q3 2024 Conference Call, Massaro again showed that he was closely monitoring Flywire's revenue by assuring investors that Flywire had strong "Rule of 40" growth (*see* Paragraph 70).

### B. Core Operations

124. Flywire's Canadian and Australian markets amounted to a core operation of the Company—these markets were so significant to the Company's success that it would be absurd to

suggest that Defendants were not tracking them. At all relevant times, Flywire's education vertical in the Company's Canadian and Australian markets represented roughly one fourth of the Company's revenues. The Canadian and Australian markets accounted for approximately 15% and 10%, respectively, of Flywire's revenues, and so accounted for approximately 25% in total, according to FE1. Accordingly, a 30% reduction in these markets amounted to a 7.5% reduction in the Company's total revenues—a highly material amount. A reduction in 7.5% of the Company's revenue growth was sufficient to prevent Flywire from claiming that it was a Rule of 40 company.

## VIII. CLASS ACTION ALLEGATIONS

125. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Flywire securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

126. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Flywire securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Flywire or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

127. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

129. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Flywire;
- whether the Individual Defendants caused Flywire to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Flywire securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

130. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

131. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Flywire securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Flywire securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

132. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

133. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. COUNT ONE

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

134. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

135. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

136. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Flywire securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Flywire securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

137. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Flywire securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Flywire's finances and business prospects.

138. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth

in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. These acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

139. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Flywire, the Individual Defendants had knowledge of the details of Flywire's internal affairs.

140. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Flywire. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Flywire's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Flywire securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Flywire's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Flywire securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

141. During the Class Period, Flywire securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Flywire securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Flywire securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Flywire securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

142. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## X. COUNT TWO

**For Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

144. Plaintiffs repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145. During the Class Period, the Individual Defendants participated in the operation and management of Flywire, and conducted and participated, directly and indirectly, in the conduct of Flywire's business affairs. Because of their senior positions, they knew the adverse non-public information about Flywire's misstatement of income and expenses and false financial statements.

146. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Flywire's financial condition and results of operations, and to correct promptly any public statements issued by Flywire which had become materially false or misleading.

147. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Flywire disseminated in the marketplace during the Class Period concerning Flywire's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Flywire to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Flywire within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Flywire securities.

148. Each of the Individual Defendants, therefore, acted as a controlling person of Flywire. By reason of their senior management positions and/or being directors of Flywire, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Flywire to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Flywire and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

149. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Flywire.

## XI. PRAYER FOR RELIEF

150. WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XII. JURY DEMAND

151. Plaintiffs demand a trial by jury in this Action.

Dated: May 7, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
E-mail: jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Co-Lead Plaintiff Cole Hickman and Co-Lead Counsel for the Class*

**ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
philkim@rosenlegal.com
lrosen@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Co-Lead Plaintiff Jason Haas and Named Plaintiff Richard Butler and Co-Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff Cole Hickman*

**CERTIFICATE OF SERVICE**

I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on May 7, 2026. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Austin P. Van*
Austin P. Van